# STATE OF MICHIGAN

# COURT OF APPEALS

ROBERT W. BRIGGS and ALYSSA
LENHOFF-BRIGGS,

Plaintiffs-Appellees,

v

KIDD & LEAVY REAL ESTATE CO., L.L.C.,

Defendant-Appellant,

and

THEODORE SZYDLOWSKI, NORA
SZYDLOWSKI,

Defendants/Third-Party Plaintiffs,

and

ROLLING MEADOWS PROPERTIES, L.L.C.
doing business as GASLIGHT GROUP
PROPERTIES, and MICHAEL McCARTHY,

Third-Party Defendants.

UNPUBLISHED
September 25, 2018

No.  340713
Emmet Circuit Court
LC No.  16-105344-NO

Before:  METER, P.J., and K. F. KELLY and GLEICHER, JJ.

PER CURIAM.

Defendant-appellant, Kidd & Leavy Real Estate Company, L.L.C. ("defendant"), appeals by right a final judgment entered in favor of plaintiffs-appellees, Robert W. Briggs ("Robert") and Alyssa Lenhoff-Briggs ("Alyssa") in a case alleging fraud and misrepresentation in a real estate transaction.  Although the trial court erred in failing to grant defendant summary disposition on plaintiffs' claims under Michigan's Occupational Code ("MOC"), MCL 339.2501 *et seq.*, and the Michigan Consumer Protection Act ("MCPA"), MCL 445.901 *et seq.*, we affirm the judgment in all other respects.

## I.  BASIC FACTS

-1-

Plaintiffs, who lived in Ohio, wanted a home for Alyssa's mother, Nancy Cribbs Lenhoff ("Nancy"), who decided to return to Michigan after a number of years in Ohio. Alyssa's sister recommended that Alyssa consult Kyle Lieberman ("Lieberman") at defendant's company. Alyssa and Lieberman had phone and email contact and decided that Lieberman would show plaintiffs and Nancy a number of homes in the Petoskey area on September 26, 2015. One of the homes was 1425 Bay View Heights. Alyssa was particularly intrigued by the garden lot next to the home. This lot was referred to as "Lot 7," the "garden lot," or the "sun garden" throughout the lower court proceedings. We will refer to it as the garden lot. The Multi-List System (MLS) contained information that all three lots were included in the transaction and also contained a number of photographs of the gardens. Plaintiffs alleged that Lieberman also made specific representations that the garden lot was included in the transaction. However, unknown to plaintiffs and Lieberman, the sellers, Theodore ("Ted") and Nora ("Nora") Szydlowski, had sold the garden lot to their neighbors the year before. The transaction was orchestrated by their listing agent, Michael McCarthy ("McCarthy"), who worked at Rolling Meadows Properties, LLC, doing business as Gaslight Group Properties ("Gaslight"). Apparently, McCarthy failed to update the MLS and remove the pictures of the garden lot.

After viewing the home, plaintiffs, believing that the transaction included the garden lot, ordered Lieberman to write a purchase agreement to present to the Szydlowskis. After several offers and counter-offers, plaintiffs purchased the home for $517,500. In fact, the home was built over Lots 5 and 6; the garden lot was not included in the sale. Plaintiffs allegedly first learned of the mix-up just hours after closing. Plaintiffs sued defendant and the Szydlowskis. The Szydlowskis then filed a third-party complaint against McCarthy and Gaslight. Much of the procedural background is irrelevant. By the time of trial, the remaining claims were plaintiffs' claims against defendant for fraud, negligent misrepresentation, violation of the MCPA, violation of the MOC, and breach of fiduciary duty. At trial, it was plaintiffs' theory that Lieberman believed the transaction included two lots – one with the house (Lot 5) and the other with the garden (Lot 6). Plaintiffs believed that Lieberman failed to properly ascertain what was being sold and that he made misrepresentations that caused them to believe the garden lot was included in the transaction. In response, defendant argued that plaintiffs had plenty of information at their disposal that would have shown they were only buying Lots 5 and 6. Following a two-day bench trial, the trial court entered judgment in plaintiffs' favor and awarded damages in the amount of $100,000.

## II. FAILURE TO GRANT SUMMARY DISPOSITION

Defendant argues that the trial court erred when it failed to grant summary disposition based on the purchase agreement itself and that plaintiffs' attempt to change the terms of the contract violated the parol evidence rule. Defendant also argues that the trial court erred when it failed to grant summary disposition on plaintiffs' claims under MOC and MCPA.

An appellate court reviews de novo the trial court's decision to grant or deny a motion for summary disposition. *Adair v State*, 470 Mich 105, 119; 680 NW2d 386 (2004). "MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. The court considers the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted or filed in the action to determine whether a genuine issue of any material fact exists to warrant a trial." *Id*. at 337. "A genuine issue of material fact exists when the record, giving the benefit of reasonable

doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "The court is not permitted to assess credibility, or to determine facts on a motion for summary judgment." *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994).

## A. THE PURCHASE AGREEMENT

Defendant argues that the trial court should have granted defendant summary disposition based on the purchase agreement, which was clear and unambiguous. It provided for the sale of Lots 5 and 6. Defendant maintains that, because Lots 5 and 6 were provided for in the purchase agreement, there is no need to "fill in any gaps" with parol evidence. Additionally, the purchase agreement contains a merger clause, which likewise prohibits the use of parol evidence to vary the terms of the contract.

In this case, the trial court correctly concluded that the parol evidence rule is properly confined to contract law. The parol evidence rule is well settled:

> The parol evidence rule may be summarized as follows: parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous. This rule recognizes that in back of nearly every written instrument lies a parol agreement, merged therein. The practical justification for the rule lies in the stability that it gives to written contracts; for otherwise either party might avoid his obligation by testifying that a contemporaneous oral agreement released him from the duties that he had simultaneously assumed in writing. In other words, the parol evidence rule addresses the fact that disappointed parties will have a great incentive to describe circumstances in ways that escape the explicit terms of their contracts.
>
> However, parol evidence of prior or contemporaneous agreements or negotiations is admissible on the threshold question whether a written contract is an integrated instrument that is a complete expression of the parties' agreement. [There are] four exceptions to the parol evidence rule, [where] extrinsic evidence is admissible to show (1) that the writing was a sham, not intended to create legal relations, (2) that the contract has no efficacy or effect because of fraud, illegality, or mistake, (3) that the parties did not integrate their agreement or assent to it as the final embodiment of their understanding, or (4) that the agreement was only partially integrated because essential elements were not reduced to writing. [*UAW-GM Human Res Ctr v KSL Recreation Corp*, 228 Mich App 486, 492–493; 579 NW2d 411 (1998) (quotation marks and citations omitted.]

While parol evidence can be used to show that a written agreement is not fully integrated, an explicit integration clause is conclusive evidence that an agreement is "the final embodiment of [the parties'] understanding." *Id*. at 493–495.

Defendant cites *Saveway Food Ctr v McNichols Real Estate*, unpublished per curiam opinion of the Court of Appeals, issued June 29, 2010 (Docket No. 290614), lv den 488 Mich

915 (2010).  In *Saveway*, the buyers and the sellers entered into a purchase agreement that specifically delineated the property to be purchased.  The buyers later sued the sellers, arguing that the sellers had represented that they were selling a larger parcel when, in fact, they were only conveying a smaller portion of the larger parcel.  Still, the purchase agreement and subsequent documents clearly indicated the precise parcel that would be conveyed.  The trial court rejected the buyers' claim that parol evidence was admissible to resolve a latent ambiguity in the purchase agreement, concluding that there was no misrepresentation in the agreement itself in that the buyers received exactly what was described in the agreement.  *Saveway*, slip op, pp 1-3.  This Court agreed.  It first noted that: "the purchase agreement represents the 'entire agreement' . . . and 'supersedes all prior Agreements and Memoranda.'  The purchase agreement is detailed and complete on its face; therefore, there is no need to fill gaps." *Id.* at 5.  In rejecting that extrinsic evidence demonstrated a latent ambiguity, this Court added:

> The plain language of the purchase agreement identifies the property to be conveyed. Had the parties intended the sale to include the disputed property, there would have been no purpose in first identifying the totality of defendants' property, and then carving out and identifying the portion of that property that was the subject of the purchase agreement. [*Id.* at 6.]

Simply stated: "there is no ambiguity in the description of the property to be conveyed in the purchase agreement and, therefore, the parol evidence rule bars the admission of extrinsic evidence." *Id.*

Unlike *Saveway* where the *buyers* sued the *sellers*, the case at bar is one where the *buyers* sued their *agent*.  This is a critical distinction.  Defendant, through Lieberman, was not a party to the purchase agreement.  Instead, defendant was an agent for plaintiffs who were a party to the purchase agreement.  By the time the case went to trial, there was no conflict between the *buyers* (plaintiffs) and the *sellers* (the Szydlowskis) over what was actually agreed to; the conflict was between the *principles* (plaintiffs) and their *agent* (defendant) over Lieberman's actions that resulted in plaintiffs getting less than what they thought they had bargained for.  If this was a breach of contract case between the buyers and the sellers, then the result would be different.  But because this is a tort action between buyers and their agent, contract principles are not at play.  The trial court correctly denied summary disposition on defendant's parol evidence theory.  Given that the parol evidence rule has no application, we need not address whether there was a merger clause within the purchase agreement.

## B.  MICHIGAN'S OCCUPATIONAL CODE

In this case, the trial court erred in determining that plaintiffs' action was not barred by the MOC.  In *Claire-Ann Co v Christenson & Christenson*, 223 Mich App 25, 30-31; 566 NW2d 4 (1997), the sellers (the plaintiffs) sued their agent (the defendant) after the agent failed to timely deposit an escrow check from the buyers, which was eventually rejected for insufficient funds.  The sellers argued that the agent failed to deposit the check within two days, as required under MCL 339.2512(1)(k)(*v*) ("A real estate broker shall deposit, within 2 banking days after the broker has received notice that an offer to purchase is accepted by all parties, money that belongs to others and is made payable to the real estate broker . . . ) The Court indicated that the

sellers had no private right of action under the circumstances. Under *Clair-Ann Co*, the trial court erred in denying defendant's motion to dismiss based on the MOC.

## C. MICHIGAN'S CONSUMER PROTECTION ACT

Whether the MCPA applies is a question of law that is reviewed de novo on appeal. *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 460; 750 NW2d 615 (2008).

In this case, the trial court erred in finding that defendant violated the MCPA. Plaintiffs claim that the MCPA does not include defendant's fraudulent behavior. But, as the Supreme Court has noted, "the relevant inquiry is not whether the specific misconduct alleged by the plaintiffs is 'specifically authorized.' Rather, it is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." *Smith v Globe Life Ins Co*, 460 Mich 446, 465; 597 NW2d 28 (1999). And, in *Liss v Lewiston Richards, Inc*, 478 Mich 203; 732 NW2d 514 (2007), the Court added:

> Applying the *Smith* test, the relevant inquiry "is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." This Court has not construed the meaning of "specifically authorized" under the MCPA. "Specific" means "having a special application, bearing, or reference; explicit or definite." "Authorize" means "to give authority or formal permission for; sanction." Thus, the exception requires a general transaction that is "explicitly sanctioned." [*Liss*, 478 Mich at 212–213.]

The brokering of real estate is specifically authorized under the MCPA.

In any event, it is evident that plaintiffs included a claim under the MCPA in order to obtain attorney fees. Plaintiffs do not make a strong argument to affirm and, instead, add: "In light of the fact that the trial court did not award attorney fees and the damage award is entirely independent of the court's finding that MCPA was violated, any determination by this Court that the MCPA should not have applied to this case amounts to nothing more than a harmless error." The trial court erred in failing to dismiss plaintiffs' claims under the MCPA. But any error is of no consequence in light of the fact that the trial court did not award attorney fees under the MCPA.

## III. PLAINTIFFS' CLAIMS FOR FRAUDULENT OR NEGLIGENT MISREPRESENTATION

Defendant argues that the trial court erred when it failed to recognize the long-standing principle that a party who has the means to determine that a representation is not true may not sustain a claim for fraud. Defendant acknowledges that Lieberman owed plaintiffs a duty. But defendant argues that this duty did not relieve plaintiffs of their obligation to investigate information that would have caused a reasonable buyer to question what was being purchased.

> This Court reviews a trial court's findings of fact in a bench trial for clear error and reviews de novo its conclusions of law. A finding is clearly erroneous where, although there is evidence to support the finding, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made.

An appellate court will give deference to the trial court's superior ability to judge the credibility of the witnesses who appeared before it. [*Ambs v Kalamazoo Co Rd Comm'n*, 255 Mich App 637, 651–652; 662 NW2d 424 (2003) (quotation marks, citations, and footnote omitted).]

In this case, the trial court did not err when it concluded that plaintiffs met their burden of proving the elements of fraud and negligent misrepresentation. Our Court has indicated:

To prove a claim of fraudulent misrepresentation, or common-law fraud, a plaintiff must establish that: (1) the defendant made a material representation; (2) the representation was false; (3) when the representation was made, the defendant knew that it was false, or made it recklessly, without knowledge of its truth, and as a positive assertion; (4) the defendant made it with the intention that the plaintiff should act upon it; (5) the plaintiff acted in reliance upon the representation; and (6) the plaintiff thereby suffered injury. [*Roberts v Saffell*, 280 Mich App 397, 403; 760 NW2d 715 (2008), aff'd 483 Mich 1089; 766 NW2d 288 (2009).]

"Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery." *Titan Ins Co v Hyten*, 491 Mich 547, 555; 817 NW2d 562 (2012). Similarly, "[a] claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Alfieri v Bertorelli*, 295 Mich App 189, 194; 813 NW2d 772 (2012), quoting *Unibar Maintenance Servs, Inc v Saigh,* 283 Mich App 609, 621; 769 NW2d 911 (2009).

Here, the focus is whether plaintiffs were justified in relying on Lieberman's statements. Of critical importance to this case, the *Titan* Court added that actionable fraud does not require "the party asserting fraud [to] prove that the fraud could not have been discovered through the exercise of reasonable diligence." *Titan*, 491 Mich 555. In other words, a party alleging fraud is not required "to have performed an investigation of all assertions and representations made by its contracting partner as a prerequisite to establishing fraud." *Id.* While the general rule is that there can be no fraud if the party allegedly defrauded had the means to determine the truth, such a general rule applies when the party is presented with information that it chose to ignore or when there is "some other indication that further inquiry was needed." *Alfieri*, 295 Mich App at 195. As an example, the *Alfieri* Court looked to a case relied upon by defendant – *Fejedelem v Kasco*, 269 Mich App 499; 711 NW2d 436 (2006) – wherein "the plaintiff was directly given considerable evidence that certain financial information was incomplete and unreliable, making the plaintiff negligent for nonetheless relying on it." *Alfieri*, 295 Mich App at 195.

This is not like *Fejedelem* where the party is charged with knowing what was readily before it. Here, Alyssa, Robert, and Nancy all testified that Lieberman confirmed that the purchase included the garden lot when the parties viewed the property. Lieberman also followed up on this representation when he provided Alyssa with an analysis that compared the Bay View Heights property with the Over Bay property. He indicated that the "additional lot" would fetch $50,000 on the open market. Alyssa and Robert offered explanations for why they did not rely on the site plan. Specifically, they had requested architectural drawings and, when they realized

that those drawings were incorrect, set the papers aside. There was nothing in the plat map that would have raised concerns regarding what was being purchased. And, of great importance, the preliminary title report *did* pique Robert's curiosity given the discrepancy between what the Szydlowskis had acquired and what they were seeking to convey. Robert specifically inquired why only two lots were being conveyed and Lieberman's October 8th email seemed to indicate that the third lot beyond the cedar hedges had been previously sold. This information was simply incorrect. As the trial court noted:

> The cedar hedges referenced in Lieberman's response are on the far end of the Garden Lot, i.e. on the east end of Lot 7. Hence, Lieberman's email response on October 8, 2015 indicated that Lot 7 was . . . where the "house past the Cedar hedges" was located. This is factually incorrect. The white house past the hedges further to the east is located on Lot 8. This incorrect information would have caused a reasonable person to conclude that the Garden Lot was included with the house on Lots 5 and 6. The email, together with the prior representations, caused Plaintiffs to reasonably believe that their anticipated purchase included the Garden Lot.

As the trial court properly noted, plaintiffs' met their burden of proving fraud and negligent misrepresentation.

## IV. THE TRIAL COURT'S FACTUAL FINDINGS

Defendant argues that the trial court erred in finding that plaintiffs relied on Lieberman's alleged statements regarding the garden lot when the testimony clearly revealed that plaintiffs also relied on the MLS, photographs, and a 2009 Chicago Tribune article. Defendant also claims that the trial court inexplicably ignored the Szydlowskis' testimony.

MCR 2.613(C) provides that "[f]indings of fact by the trial court may not be set aside unless clearly erroneous. In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." "The credibility of witnesses is a question for the trier of fact, and in a bench trial special regard is given to the findings of the trial court." *Sweetman v State Hwy Dep't*, 137 Mich App 14, 20; 357 NW2d 783 (1984).

Plaintiffs acknowledge and do not deny that the MLS listing, photographs, and a 2009 Chicago Tribune article, contributed to their desire to see the property and led them to believe that the garden lot was included. That these other facts played some role in plaintiffs' understanding of the transaction is not seriously in doubt. However, defendant cannot avoid that Lieberman's October 8th email and other assertions formed the basis for plaintiffs' reliance that the garden lot was included. Therefore, to the extent plaintiffs may have considered the listing, pictures, and article to include the garden lot, such consideration was confirmed through Lieberman.

Defendant next argues that the trial court erred when it failed to give credence to the Szydlowskis' testimony because it relied on an inaccurate photo of what the garden lot would have looked like from across the street. Defendant maintains that the photo did not represent

how the burning bushes appeared on the September 26, 2015 showing, because the photo was taken in winter and did not show the extensive pruning that Ted performed that allowed a view beneath and between the bushes. However, the trial court did not simply rely on the wintertime photo when it concluded that the Szydlowskis could not see the garden lot from their vantage point across the street. The trial court concluded that the Szydlowskis were not in a position to look under the bushes from their position with the neighbor. And, contrary to defendant's assertions, the trial court did not discredit the Szydlowskis' testimony regarding boundary stakes; it merely concluded that the stakes may not have been as obvious as the Szydlowskis implied. In so concluding, the trial court noted that even McCarthy, who was the listing agent and visited the property numerous times, testified that he only noticed one stake. The trial court added that "this testimony suggests that the presence of stakes on the boundary was not very conspicuous." In fact, Lieberman testified that he never noticed any boundary stakes.

Defendant next argues that the trial court erred when it interpreted Lieberman's statement to McCarthy that Lieberman was "pitching outside the zone just to throw that place over the plate." Defendant argues that, taken in context, Lieberman did not mean that he was pushing plaintiffs to buy the Bay View Heights property, only that he was trying to make sure they would have a showing. Again, the weight and credibility of the evidence was for the trial court as trier of fact. Additionally, the trial court looked primarily to Lieberman's statements during the September 26th showing and his October 8th email wherein plaintiffs were led to believe that the garden lot was included. Therefore, even if the text was allegedly taken out of context, Lieberman made other representations that the garden lot was included.

The same analysis is true for defendant's claim that the trial court erroneously relied on plaintiffs' "spotty and inconsistent testimony" and McCarthy's rebuttal testimony while discrediting Lieberman's testimony. Again, as the trier of fact, the trial court judge was best positioned to assess the witnesses' credibility. The trial court's extensive opinion reflects that it was well aware of the issues before it and that it carefully reviewed the record. It cannot be said that the trial court erred when it ultimately determined that Lieberman's statements caused plaintiffs to reasonably believe that their purchase included the garden lot.

V. DAMAGES

Defendant argues that the trial court erred in assessing damages based upon what the previous purchasers paid for the property rather than an objectively determined value.

An appellate court reviews a trial court's determination of damages following a bench trial for clear error. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 513; 667 NW2d 379 (2003). An appellate court "will not set aside a nonjury award merely on the basis of a difference of opinion." *Marshall Lasser, PC v George*, 252 Mich App 104, 110; 651 NW2d 158 (2002), quoting *Meek v Dep't of Transportation*, 240 Mich App 105, 121; 610 NW2d 250 (2000). "Clear error exists where, after a review of the record, the reviewing court is left with a firm and definite conviction that a mistake has been made." *Marshal Lasser*, 252 Mich App at 110.

The trial court's award is supported by the record. Jason Vizina from Northern Michigan Appraisal Company provided a valuation for the garden lot as of October 16, 2015. Although it

had significant landscaping, its highest and best use would be to place a structure on it, which would involve eliminating or moving much of the landscape. Still, Vizina assigned it an additional $10,000 for its curb appeal and ability to woo potential buyers. Vizina believed the garden lot was worth $54,000 on October 16, 2015. Vizina was aware that the garden lot sold to the neighbors for $100,000. He explained that "more often than not that neighboring properties pay a premium if they want to control that. They are kind of informally identified as a captive market . . ." The value to an adjacent property owner might be higher than on the open market and there was no formula to conclude what that value might be.

Additionally, the fact that plaintiffs were able to obtain a good deal as far as the home with the lot on it does not change the fact that, due to Lieberman's representations, they believed they were also buying the garden lot. In keeping with *Smith v Michigan Realty & Construction Co*, 175 Mich 600, 607; 141 NW 635 (1913), "the measure of damages is the difference between the actual value of the property at the time of the sale or exchange, and what it would have been worth had it been as represented, or what its value was represented to be, and that this measure of damages applies without regard to the price paid or the value of the property given in exchange by the party defrauded . . ."

There is record evidence to support the trial court's award. The Szydlowskis sold the garden lot for $100,000 to their neighbors a year before plaintiffs purchased the home. Although transactions between neighbors might involve higher sale prices due to the unique circumstance, the fact remains that the lot was purchased in the open market in an arms-length transaction. "It is true that damages that are speculative or based on conjecture are not recoverable. However, it is not necessary that damages be determined with mathematical certainty; rather, it is sufficient if a reasonable basis for computation exists." *Chelsea Inv Group LLC v Chelsea*, 288 Mich App 239, 255; 792 NW2d 781 (2010).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Patrick M. Meter
/s/ Kirsten Frank Kelly
/s/ Elizabeth L. Gleicher